LANDRY, Judge
This is a petitory action wherein plaintiff seeks to be declared owner of a triangular shaped parcel of land situated within the municipal limits of the City of Morgan City. After trial on the merits, the court below rejected plaintiff’s demands and rendered judgment recognizing defendants as owners of the property in dispute. Plaintiff has appealed. We conclude that in dismissing plaintiff’s action our colleague below has fallen into error.
It is conceded that plaintiff is the owner of Lot H, Hanson Annex, Morgan City, which said lot has a front of 150 feet on the south side of Belanger Street by a depth between parallel lines of fifty feet. Lot H is bounded north by Belanger Street, east by Lot “G” (which does not feature in this litigation), west by Berwick Bay and on the south by properties of defendants Overhultz and Beadle hereinafter described. The adjoining lot of defendants Mr. and Mrs. Harry P. Overhultz fronts 96 feet on Berwick Bay and runs easterly therefrom to a depth and front of 80 feet, between parallel lines, along an alley which constitutes its southern boundary. The adjacent property of defendants Mr. and Mrs. Palmer A. Beadle bounds that of the Over-hultzes on the east. It measures 58 feet front on the alley forming the southern boundaries of the Overhultz and Beadle properties by a depth of 96 feet to Lot H of plaintiff on the north. It thus appears the southern boundary of plaintiff’s property constitutes the northern boundary of the lots owned by defendants.
At issue herein- is a triangular shaped parcel of land commencing at the northeast corner of the Beadle lot and running southwesterly therefrom on such course as to intersect the west boundary of the Over-hultz property at a point approximately 18 feet south of its northwest corner (the southwest corner of plaintiff’s lot).
In essence appellant claims that despite the ideal south boundary recited in his deed of acquisition, a fence has long stood along the hereinabove described line extending from the northeast corner of the Beadle property to the west line of the Overhultz lot. He further maintains this fence has continuously been recognized by all parties as marking the common boundary between their properties. Finally, appellant alleges he and his ancestors in title have continuously, for more than thirty years, possessed as owners all lands lying to the north of the alleged boundary fence. On this premise appellant claims title to the disputed strip by *447 virtue of the prescription of 30 years provided in LSA-C.C. Article 852.
Defendants, however, successfully argued before the trial court that the fence in question was never regarded, recognized or deemed a boundary fence by the adjoining owners. Appellees further contended (and the trial court so held) that by tacit agreement and understanding of all concerned, the alleged boundary fence was erected, repaired, moved and rebuilt from time to time to suit the personal needs of the respective parties each of whom continuously possessed to the limits of his individual deed of purchase.
It is settled jurisprudence that in a petitory action one may rely upon the 30 year prescriptive period provided in LSA-C.C. Article 852 as well as that stipulated in LSA-C.C. Article 3499. Stanford v. Robertson, La.App., 144 So.2d 747.
Equally well established is the rule that one pleading the prescription of 30 years contained in LSA-C.C. Article 852 may tack on the possession of his successive predecessors in title. Opdenwyer v. Brown, 155 La. 617, 99 So. 482.
Pursuant to LSA-C.C. Article 852 one who possesses continuously as owner, for a period of 30 years to a visible boundary, acquires prescriptive title to all lands up to the boundary notwithstanding a portion thereof may lie beyond the bounds described in his own title. Sessum v. Hemperley, 233 La. 444, 96 So.2d 832, see page 843.
During most of the period with which we are concerned herein, and until plaintiff’s purchase of Lot H, the three lots involved in this litigation were owned by a Mr. M. F. Kleinpeter, his relatives and in-laws.
The record discloses that Kleinpeter purchased Lot H (the southern boundary of which forms the subject matter of this lawsuit) in 1905 and resided thereon continuously until 1937 when the property was foreclosed and adjudicated to a bank holding a mortgage thereon. The lot now owned by defendant Beadle was purchased by Kleinpeter in 1911, and by him sold to Beadle in 1913. Beadle is the husband of Kleinpeter’s step-daughter, Rilma Robbins Beadle. The Beadles have lived on their property continuously since their purchase. In 1940 (following Kleinpeter’s death) the bank sold Lot H to plaintiff Bergeron. The lot presently belonging to defendants Overhultz (which forms the southern boundary of the Bergeron lot and the western boundary of the Beadle property) was acquired by defendant Palmer Beadle from his brother Clarence in 1918. This latter lot was sold by Beadle in 1956 to his daughter and son-in-law, Mr. and Mrs. Overhultz.
Plaintiff contends that Kleinpeter, his ancestor in title, constructed and maintained a fence along the southern or rear boundary of Lot H separating said lot from defendants’ lots to the south thereof. It appears, however, that the fence did not run parallel to the southern boundary of Lot H but instead commenced 50 feet south of its north boundary at the northeast corner of the Beadle lot and from thence ran southwesterly at an angle across both the Beadle and Overhultz lots intersecting-the latter’s west line 68 feet south of the northwest corner of Lot H.
In substance Bergeron testified that although he did not acquire Lot H until 1940, he nevertheless recalled from personal observation that the fence in question existed as described during the interval 1919 until its removal by defendants-in 1957 — a period of 38 years. According to plaintiff, the Overhultz property was occupied in 1919 by one Eber Beadle-with whom plaintiff was acquainted. In 1923 Bergeron purchased muskrats from. Kleinpeter who then resided on Lot H. *448 Bergeron recalled discussing business with Kleinpeter in the kitchen of his home which adjoined a porch which in turn was within two feet of the fence in question. He also stated that he continued doing business with Kleinpeter until he pur■chased Lot H from the bank in 1940, during which entire period the fence remained in the same position. Bergeron further stated that when he occupied the property as owner in 1940 the fence then •appeared to be very old. He described it as being vine covered and characterized 'the adjoining lots as resembling a forest. Bergeron also remembered that Kleinpeter ■operated a grocery store on Lot H and sold ■muskrats, alligators and turtles and constantly used and occupied the property up to the fence during his entire period of -ownership. After purchasing from Klein-peter, plaintiff enlarged and rebuilt the 'kitchen attached to the dwelling and con-structed a workshop within four or five inches of the fence line. In 1950 plaintiff leased the western portion of Lot H describing it as being 50 feet in depth and 'bounded on the south by lands of Palmer Beadle. Notwithstanding the recitations in his act of acquisition and lease, plaintiff ■stated he always assumed the fence to be the boundary line although he conceded he was never expressly advised to that effect.
Stephen O. Stevens, nephew of Mr. Kleinpeter, lived on the property with his uncle from 1916 to 1918. In 1938 he moved from the vicinity but continued to visit the Kleinpeter home as though it were his own from 1918 to 1938. He recalled that the property was fenced in 1916, and a small porch and kitchen extended off the main house to a point near the fence. A small gallery where family washing was done was described by Stevens as “not jammed against the fence but it was close.” According to Stevens a •cistern was situated on the Kleinpeter lot mear the fence and a platformed walkway extended from the rear of the house toward the fence. Stevens also testified there was a space of only three or four feet separating the fence from the house— just about sufficient room for a person to pass between. He was of the further opinion his uncle considered the fence the boundary because not only were improvements erected near the enclosure but also his uncle raised a garden and kept chickens behind the house. He conceded that during the period 1916-1938 repairs were made to the fence from time to time and, once when it was torn down, the Beadles repaired it shortly thereafter. The fence, however, continuously remained along the same line.
Notwithstanding the sale of Lot H to a bank in a foreclosure proceeding against Kleinpeter in 1937, and plaintiff’s subsequent acquisition in 1940, nevertheless Lot H remained constantly in possession and was continuously occupied, even while under seizure.
Adam Provost, testifying on behalf of appellant, stated he was a tenant on the Kleinpeter lot from 1935 uninterruptedly until 1943. He rented from Kleinpeter until the latter’s demise; from the bank while the property was under seizure and from plaintiff after plaintiff became owner.
Provost also testified he lived in the residence on the property during the entire time he was tenant. He recalled the fence ran in a straight line; that it was constantly maintained and that it was never moved from its original location. He made a garden and raised chickens in the area back of the house up to the fence. Provost further testified the fence was situated approximately 3 to 5 feet from the house except where part of the porch extended so close to the fence that a person could not walk between the fence and the porch.
*449 Edgar L. Barras stated he resided on plaintiff’s property continuously from December 4, 1941, to the date of trial. He first went on the Kleinpeter lot in 1927 following a flood, at which time he was living on the Beadle property. To have a saw sharpened, he went from the Beadle lot to Kleinpeter’s store situated on Lot H passing through a gate in the fence in question. He recalled that in 1927 the fence was very old. He also testified he frequented the property from 1927 to 1941, when he moved into a house situated on the Kleinpeter property. He further stated the fence remained intact during this entire period until it was removed by defendants prior to plaintiff instituting this action. Barras always considered the fence as the boundary between the respective estates and while a tenant on the Kleinpeter lot, he continuously used all property north thereof. According to Bar-ras while the fence was occasionally reworked and new posts replaced as needed, it was never moved. He testified that the new fence erected by defendant Overhultz runs into the side of the house in which he lived giving the impression the rear of the house extends south of the line claimed by Over-hultz whereas the former fence was situated about one foot south of the back porch. Some 14 or 15 years prior to the trial, Barras constructed a workshop which extended to within 6 inches of the fence. Since Overhultz built the new fence the workshop appears to be to the south thereof. At one time Barras maintained a duck yard between the rear of the house and the fence which was built of wire and homesplit posts. Finally, he recalled that during his tenancy only the Palmer Beadles repaired the fence and in so doing, they never changed its location. He stated that had the fence been moved any distance at all to the north it would have prevented his walking behind his house.
The testimony of William Stokes is to the effect that as a boy he worked in the grocery store operated by Kleinpeter on Lot H. He was on the property daily from 1926 to 1937. During this interval the fence stood in the same location although repairs were made thereto from time to time. He estimated a distance of five feet intervened between the fence and the main house situated on the Klein-peter lot. He recalled that Kleinpeter continuously used the property to the fence and that none of the occupants of the Beadle or Overhultz lots ever used any property north of the fence. Stokes left the area in 1937 and had no knowledge of the use of the property thereafter.
Leland L. Beadle, son of defendants Mr. and Mrs. Palmer Beadle (step-grandson of decedent Kleinpeter) in substance stated he was born in 1914 in a house situated on the Beadle lot. He lived there until 1937, spending much of his time with Mr. Klein-peter. In 1928 he ordered a small pecan tree from a seed catalogue which tree he and his stepgrandfather planted on what the witness considered the boundary, the point being two or three feet north of the fence line. He concedes the fence was in continuous existence excepting in 1926 and 1934 when it was destroyed by hurricanes but that it was quickly rebuilt. He also recalled that his mother planted a flower garden on her side of the fence and that his parents maintained the fence to keep chickens from the garden. He was of the opinion that the fence was originally constructed by his parents and grandparents and could not recall his parents ever contending that Kleinpeter was encroaching upon their property. The isolated incident regarding the pecan tree is not, in our judgment, sufficient to outweigh the otherwise overwhelming evidence that the fence in question was considered a boundary fence. It further appears from the testimony of Mrs. Beadle that the location of the tree was decided upon because Mr. Kleinpeter did not wish it planted in his front yard as the tree would eventually produce too much shade.
Defendant, Mrs. Rilma Robbins Beadle, testified she lived with her stepfather, *450 Kleinpeter, from 1911 to 1913. When she married she moved next door where she and her husband have lived continuously since. According' to Mrs. Beadle the fence in question was never intended or regarded as a boundary fence but only served to separate the gardens, chicken yards and dog yards kept and maintained by the adjoining owners. Mrs. Beadle testified further that on those occasions when the fence was rebuilt after being destroyed by hurricanes, each time it was reconstructed a foot or two further south excepting the last time in 1937 when it was moved some 6 or 7 feet closer to her home. She stated the pecan tree planted by her son and Mr. Kleinpeter was planted on the line so that Mr. Kleinpeter might get half the pecans therefrom. In 1934 when the fence was rebuilt, it was moved around the tree. She acknowledged the fence was in existence since 1911 and that she used her property up to the fence from 1913 until the fence was torn down in 1956 to permit the moving of a house across the adjoining properties.
Defendant, Palmer A. Beadle, testified he purchased the property which he now occupies from his stepfather-in-law, Klein-peter, in 1913, and moved into a house situated thereon on his wedding day. Since that time he has continuously occupied the premises. He acknowledged a close relationship with his stepfather-in-law and the total absence of any disagreement regarding the location of the boundary line between their properties. He purchased what is now the Overhultz property from his brother Clarence in 1918 and deeded said property to his daughter in 1956. He stated that while he never intended the fence as a boundary nevertheless he actually and physically possessed the entire lot up to the fence. Pie grew flower and vegetable gardens thereon, maintained dog, duck and chicken yards and even kept a pig or two. From time to time the fence was partially or wholly blown down by storms but it was always repaired and replaced at its former location. He frankly conceded using the property only to the fence and admitted that Kleinpeter occupied up to the fence on the other side.
Mrs. Carmelite Overhultz, daughter of Mr. and Mrs. Beadle, testified she was 41 years of age at the time of trial and that she was born and reared on the Beadle property. She and her husband purchased their property in 1956. She testified she recalled a garden and chicken yard situated on her parents’ lot south of the fence.
While there is some testimony, particularly by Mrs. Beadle, to the effect the fence was not straight but rather was crooked and did not run in a straight line, in this respect she is contradicted by the disinterested witnesses, Barras and Stevens, who in effect testified the fence was perfectly straight. In this regard Stevens testified that when the fence was partially destroyed by storm in 1934, he assisted in rebuilding it on the identical line on which it stood prior thereto.
Moreover, there appears of record a plat of survey showing the estates of plaintiff and defendants prepared by T. F. Kramer, Civil Engineer (see Exhibit D-l, Page 21 of the record) which shows that the ideal boundary line advocated by appellees infringes upon certain buildings and improvements standing upon appellant’s property. In the absence of proof to the contrary, it must be assumed that the parties who erected these structures claimed ownership of the property upon which said buildings are situated.
In his written reasons for judgment our worthy brother below concluded the record was barren of testimony showing possession by Kleinpeter, the bank or plaintiff during the period 1905-1940.
We believe the record indicates otherwise. It appears Lot H was continuously occupied by Mr. and Mrs. Kleinpeter from *451 1905 to 1937, together with Mrs. Beadle from 1911 to 1913 and with Stevens from 1916 to 1918. It is undisputed that Adam Provost occupied the premises as tenant of the record owners from 1935 to 1943, without interruption, during which interval he possessed all of the property to the fence believing it to he the boundary. It further appears that another portion of Lot H was possessed by another tenant, Barras, from 1941 to the date of trial. While the record does not show the exact date or by whom the fence was initially erected, this circumstance is a matter of no moment. The record does show that the fence was in existence continuously from 1911 until it was torn down by defendants in 1956 which 'action prompted this lawsuit.
We find in the testimony as here-inabove analyzed, ample evidence that the owners and occupants of the Kleinpeter home possessed the property up to the fence in various ways. Additions to the house extended virtually to the fence. Structures such as a workshop and cistern were erected on that portion of defendants’ properties north of the fence. Moreover, the area north of the fence was utilized by the owners and occupants of Lot H as though it were part of the Kleinpeter property by making gardens and constructing a walkway thereon and devoting the area as a place where clothes were washed.
We find that the record does not support defendants’ contention the adjoining owners never considered the fence a boundary fence. We find that plaintiff’s ancestors in title and those who possessed under them did in fact consider the fence the bottndary and continuously possessed to the fence. Under such circumstances it is immaterial by whom the fence was constructed or precisely when. We are of the further opinion the fence was through miscalculation erected south of the ideal boundary and was permitted to remain there without contest for more than the 30 year period required.
We conclude therefore the dual requirements of Sessum v. Hemperley, 233 La. 444, 96 So.2d 832, 843, namely, existence of a visible boundary and uninterrupted possession to such boundary for a period of thirty years, have been shown by plaintiff herein.
Accordingly, it is ordered, adjudged and decreed that the judgment of the trial court rejecting and dismissing plaintiff’s demand and recognizing defendants as owners of the property in dispute herein shall be and the same is hereby annulled, reversed and set aside.
It is further ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, T. H. Bergeron, and against defendants, Mr. and Mrs. Over-hultz and Mr. and Mrs. Beadle, recognizing and declaring plaintiff owner of the following described property:
A certain triangular shaped parcel of ground located, lying and being situated in Hanson Annex of the City of Morgan City, Parish of St. Mary, State of Louisiana, bounded as follows: Commencing at the Northeast corner of the property of Palmer Beadle shown on map of T. F. Kramer, C. E., dated at Franklin, Louisiana, January 14, 1959, and from thence proceeding in a straight line along a course which intersects the property of H. P. Overhultz (as shown on the aforesaid Kramer plat) at a point 18 feet South of the Southwest corner of the T. Bergeron lot (as shown on the aforementioned Kramer plat) and corner; thence running in a Northerly direction along the same course as the Western boundary of the T. Bergeron lot a distance of 18 feet to the Southwest corner of the T. Bergeron lot and corner ; and thence running along the Southern boundary of the T. Bergeron lot to the Northeast corner of the Palmer Beadle lot, the point of beginning.
Reversed and rendered-